IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| POLLY ANNE FERRIS, | ) | Case No. 5:16-cv-2459 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | THOMAS M. PARKER |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | **MEMORANDUM OF OPINION AND** |
| | ) | **ORDER** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff Polly Anne Ferris seeks judicial review of the final decision of the

Commissioner of Social Security ("Commissioner") denying her application for disability

insurance benefits ("DIB") under Title II of the Social Security Act.  The parties have consented

to my jurisdiction. (ECF Doc. 15.)  Because the Commissioner's decision is supported by

substantial evidence, it must be AFFIRMED.

## II.      Procedural History

In 2013, Ferris filed an application for DIB, alleging disability beginning on September

30, 2009.[1]  (Tr. 283-89).  After the Social Security Administration denied her application, she

attended a hearing before Administrative Law Judge Joseph G. Hajjar ("ALJ").  (Tr. 141-191,

244-247, 249-251)  On July 23, 2015, the ALJ denied Ferris' claim for benefits.  (Tr. 121-135)

---

[1] The Commissioner contends that Ferris was last insured for DIB benefits as of December 31,2014; thus, disability must have been established on or before that date in order for Ferris to be entitled to DIB benefits.  *See* 20 C.F.R. § 404.131; Doc. 13 at PageID # 1191.

The Appeals Council declined to review the case, rendering the ALJ decision the final decision of the Commissioner. (Tr. 1-7)

## III. Evidence

### A. Medical Evidence

Ferris treated with Dr. James Cannatti at Summit Ophthalmology from 2007 through 2014. She was diagnosed with ocular migraine headaches in November 2012. (Tr. 724, 726, 735)

In October and November 2011, Ferris complained of diarrhea and hemorrhoids. (Tr. 424) On November 29, 2011, she complained of joint pain and swollen hands to Dr. James Johnston. (Tr. 426) On December 16, 2011, Ferris presented to the emergency room complaining of joint pain and stating that she had a question regarding her hemorrhoids. (Tr. 813) On December 19, 2011, Dr. Johnson prescribed Percocet for her pain and diagnosed irritable bowel syndrome ("IBS"). (Tr. 422)

On January 13, 2012, Ferris visited her primary care physician, Dr. David Kimbell, MD, with complaints of constipation, bloody stool, joint pain, sleep disturbance, and fatigue. (Tr. 509-511) Dr. Kimbell noted bony deformity and synovitis in Ferris's wrists and hands. (Tr. 510) He noted normal muscle tone, strength, respiratory functions, gait and station. (Tr. 510)

Ferris met with rheumatologist, Dr. Andrew Raynor, M.D., on January 20, 2012. (Tr. 434) Ferris reported that her joint pain and swelling had responded well to steroid treatment but that she had recently discontinued it. (Tr. 434) Dr. Raynor observed small joint polysynovitis, but normal range of motion of the upper and lower extremities, normal gait, and normal respiratory function. (Tr. 436) He diagnosed inflammatory arthritis and administered injections to Ferris's left wrist and right shoulder. (Tr. 436, 439) X-rays showed mild degenerative changes

of the big toes with a small left calcaneal spur, and soft tissue swelling around the fingers and wrists bilaterally (Tr. 437). Her hip joint spaces were well maintained. (Tr. 437) At a follow-up appointment on February 7, 2012, Dr. Raynor diagnosed rheumatoid arthritis ("RA"). (Tr. 443) He observed normal gait, normal respiratory function, and normal range of motion in the upper and lower extremities. (Tr. 443) A chest X-ray performed on February 7, 2012 returned normal findings. (Tr. 609) Dr. Raynor prescribed an anti-rheumatic/immunosuppressant, methotrexate, and advised Ferris of other treatments for rheumatoid arthritis including biologic response modifiers. (Tr. 441, 573)

Ferris met with Dr. Reynaldo Gacad, a gastroenterologist, on February 3, 2012. (Tr. 399) Ferris complained of excessive bowel movements (five times daily, at times with urgency) who initially diagnosed chronic diarrhea and GERD. (Tr. 399-401) A colonoscopy revealed no abnormalities and samples were biopsied for pathology. (Tr. 402-405) At a follow-up appointment in April 2012, Ferris continued to complain of excessive bowel movements and diarrhea. (Tr. 396-398) Dr. Gacad diagnosed IBS and prescribed medication to treat Ferris's symptoms. (Tr. 398)

Ferris returned to Dr. Kimbell on February 8, 2012 complaining of constipation, blood in stool and pain in joints. (Tr. 507-508)

Dr. Raynor prescribed Enbrel, a biologic, in March 2012. (Tr. 445) On March 23, 2012, a bone density/DEXA scan revealed T scores consistent with osteopenia in the left side of Ferris's hip. (Tr. 473) At a visit in May 2012, Dr. Raynor observed normal gait, normal respiratory function, and normal range of motion of the upper and lower extremities. (Tr. 451)

In May 2012, Dr. Kimbell noted that he was treating Ferris for RA with MTX and Enbrel. He observed hand wrist deformity, synovitis and limited range of motion. Dr. Kimbell diagnosed IBS and anxiety and considered prescribing Lexapro, an antidepressant. (Tr. 504-506)

In September 2012, Dr. Raynor noted that Ferris continued to have RA activity in her hands and feet but also noted that she was much improved since she started taking Enbrel. Dr. Raynor noted that he would consider a different biologic if Ferris continued to have RA activity at her next visit. (Tr. 453) Dr. Raynor noted pain in Ferris's muscles and joints. Ferris was no longer displaying full range of motion; Dr. Raynor noted "smoldering small joint synovitis wrists and metatarsals." (Tr. 455) However, he continued to observe normal gait and respiratory function. (Tr. 455) Dr. Raynor adjusted Ferris's medications. (Tr. 453-455)

At an office visit with Dr. Kimbell in November 2012, Ferris complained of joint pain and swelling throughout her extremities, but no fatigue, sleep disturbance or depression. (Tr. 502) Dr. Kimbell observed synovitis of the right index finger and limited range of motion of both hands. He noted normal muscle tone and strength, normal respiratory function and normal gait. (Tr. 503)

Ferris followed-up with Dr. Raynor in December 2012. He continued to note smoldering arthritis activity in Ferris's hands and feet. (Tr. 458) He discontinued Enbrel and prescribed Humira. (Tr. 458)

In February 2013, Dr. Kimbell noted that Ferris continued to suffer from anxiety, IBS and RA. (Tr. 499) He observed synovitis of the right index finger and limited range of motion of both hands. He again observed normal muscle tone and strength, normal respiratory findings and normal gait. (Tr. 501)

In March 2013, Dr. Raynor noted that Ferris was having recurrent respiratory infections and that she continued to smoke.  He ordered a chest X-ray and referred her for a pulmonary assessment. (Tr. 463)  Ferris continued to complain of muscle and joint pain.  Dr. Raynor noted "smoldering" small joint synovitis of the wrists and fingers.  Ferris had normal respiratory findings and gait.  (Tr. 465)  The chest X-ray revealed stable findings compared to imaging performed in February 2012 with no acute cardiopulmonary process. (Tr. 471-472)

Ferris met with Dr. Charles Fuenning for a respiratory evaluation on April 25, 2013. (Tr. 419)  Dr. Fuenning noted dry inspiratory crackles at end inspiration and end expiratory wheezing.  He also observed rheumatoid arthritic changes in the hands.  (Tr. 419-420)  Dr. Fuenning diagnosed rheumatoid lung ("RL"), chronic obstructive pulmonary disease ("COPD"), and personal history of tobacco use, presenting hazards to health. (Tr. 420)  He stressed that Ferris must stop smoking and discussed strategies to accomplish that.  He also prescribed an inhaler to treat Ferris's COPD. (Tr. 420)  Dr. Fuenning ordered testing which revealed moderate small airway disease with mild restrictive ventilator defect.  (Tr. 550)  A CT scan of Ferris's chest showed severe emphysema. (Tr. 551)

In June 2013, Ferris experienced persistent smoldering joint synovitis in her wrists and hands.  Dr. Raynor wanted to restart Humira but could not because Ferris continued to smoke.  He said he would reevaluate after she met with Dr. Fuenning again. (Tr. 467)

Ferris returned to Dr. Fuenning on June 27, 2013.  She continued to have respiratory difficulty, including coughing and dyspnea.  (Tr. 512)  Dr. Fuenning noted that Ferris had not quit smoking but had cut back to ½ pack per day.  Dr. Fuenning diagnosed small airway disease, emphysema, RA, COPD with exacerbation and RL. (Tr. 514)

In September 2013, Dr. Raynor noted that Ferris could resume Humira if she stopped smoking and that he would wait to hear from her. Raynor noted continued small joint synovitis, and he felt that she needed a biologic. Ferris received injections in her left shoulder and wrists. (Tr. 619)

Ferris received physical therapy for her hands in October and November 2013. (Tr. 626-628) At the end of her therapy, Ferris still had pain but indicated that she was more able to manage. (Tr. 627)

Ferris followed-up with Dr. Raynor in December 2013 and January 2014. (Tr. 648) Ferris still exhibited smoldering small joint synovitis in her wrists and metatarsals, but could not resume Humira because of her smoking. Ferris continued taking prednisone and Methotrexate Sodium. (Tr. 649-651, 647)

Dr. Raynor restarted Humira in April 2014 even though Ferris had not stopped smoking. Ferris discontinued Humira after one use. Dr. Raynor indicated that she would "rechallenge" and resume the biologic if she stopped smoking. (Tr. 679)

Ferris returned to Dr. Fuenning on June 26, 2014. She reported that her breathing had improved with medications. (Tr. 866) Dr. Fuenning continued to advise smoking cessation and diagnosed emphysema and COPD. He no longer diagnosed rheumatoid lung. He ordered additional imaging and testing. (Tr. 866-867)

In July 2014, Dr. Kimbell noted that Ferris was still smoking a pack of cigarettes each day. (Tr. 754) He also noted anxiety and depression with symptoms of sleep disturbance. He observed bony deformity and limited range of motion of the hands without edema. (Tr. 755)

Ferris returned to Dr. Raynor on July 28, 2014 and reported that she had taken three months of Humira with little benefit. She was advised to take it for an additional six weeks but if

no significant improvement she would discontinue and try Rituximab.  Dr. Raynor noted continued small joint synovitis.  (Tr. 780)

Ferris met with Dr. Kimbell in October 2014.  He noted abdominal pain and treatment for bronchitis.  Ferris continued to take Percocet for pain and Enbrel, MTX, and prednisone for RA. (Tr. 750-752)

From October 2014 through December 2014, Dr. Raynor noted that Ferris had stopped taking Humira in September.  She continued to experience pain in her eye, right shoulder, muscles and joints.  Dr. Raynor noted smoldering synovitis in her wrists and hands and positive RA factors.  Her gait and respiratory findings were normal.  Ferris continued to smoke. (Tr. 776-779, 781)

On January 7, 2014, Ferris returned to Dr. Kimbell who adjusted her medications.  He observed limited range of motion in her hands and wrists and diagnosed acute bronchitis and RA and noted that she was "immunocompromised." (Tr. 803-806)

On January 20, 2014, Ferris followed-up with Dr. Raynor.  Dr. Raynor administered another dose of Rituximab.  Dr. Raynor continued to observe smoldering small joint synovitis of the wrists and fingers, now with "multiple rheumatoid nodules."  Ferris had a normal gait and respiratory function. (Tr. 809)


**B.      Opinion Evidence**

**1.      State Agency Non-Examining Sources**

Dr. Kourosh Golestany reviewed Ferris's medical records on August 2, 2013.  He opined that Ferris could: lift twenty pounds occasionally and ten pounds frequently; stand/walk for about six hours in an eight-hour workday; sit for about six hours in an eight hour workday;

occasionally crawl; never climb ladders, ropes or scaffolds; and occasionally finger with the

hangs bilaterally. Dr. Golestany also opined that Ferris must avoid all exposure to unprotected

heights and should only work in well-ventilated areas due to her COPD. (Tr. 221-222)

Dr. John L. Mormol reviewed Ferris's records on December 4, 2013 and rendered the

same opinions as Dr. Golestany. (Tr. 236-239)

On August 7, 2013, Mel Zwissler, Ph.D., reviewed records from Ferris's psychiatric

treatment. (Tr. 218-219) Dr. Zwissler opined that Ferris had mild restrictions of activities of

daily living and mild difficulties in maintaining social functioning. He opined that she had

moderate difficulties in maintaining concentration, persistence or pace, but no repeated episodes

of decompensation. (Tr. 219) Dr. Zwissler felt that Ferris's ability to carry out detailed

instructions and her ability to perform activities within a schedule, maintain regular attendance

and be punctual were moderately limited. (Tr. 223) He further opined that her ability to

complete a normal workday and workweek without interruptions from psychologically based

symptoms and her ability to perform at a consistent pace without an unreasonable number of

length of rest periods were moderately limited. (Tr. 223)

Bruce Goldsmith, Ph.D., reviewed Ferris's records on December 3, 2013 and affirmed

the opinions of Dr. Zwissler. (Tr. 234-235, 239-240)

### 2. State Agency Examining Source

On June 26, 2013, Joshua Magleby, Ph.D., conducted a psychological examination of

Ferris. (Tr. 486-492) Dr. Magleby did not review any of Ferris's medical records. (Tr. 486) Dr.

Magleby diagnosed persistent depressive disorder, unspecified anxiety disorder, maladaptive

behavior (smoking), IBS, COPD and RA. (Tr. 490) He opined that Ferris's ability to understand

and carry out simple instructions were similar to other adults of the same age. He felt that her

comprehension seemed fair; her memory – fairly average; and her ability to follow more complex instructions – "fairly average for age expectations." (Tr. 491) Dr. Magleby opined that Ferris's ability to perform simple repetitive tasks appeared good but her ability to perform multi-step tasks seemed "somewhat impaired for age expectation." (Tr. 491) Finally, he opined that Ferris had never had any significant incidents suggesting that her ability to relate to others was impaired. He also noted that social relating during the examination was appropriate. However, he noted that emotional distress observed during the evaluation might impair her social interactions at times. (Tr. 491)

### 3. Treating Sources

Ferris's treating ophthalmologist, Dr. James Cannatti, completed a medical questionnaire on June 20, 2013. (Tr. 478 – 481) Dr. Cannatti diagnosed arthritis, dry eye syndrome, and ocular migraines. (Tr. 480) Dr. Cannatti opined that Ferris did not have any limitations from an ophthalmic standpoint except that she would need time to take her drops and must avoid dry or dusty environments. (Tr. 481)

Ferris's treating physician, Dr. David Kimbell, completed a medical questionnaire on July 11, 2013. (Tr. 494-495) He indicated that Ferris had a history of a mental impairment and that he had treated her by prescribing Lexapro. (Tr. 494) He opined that she had functional restrictions including poor coping and trouble with concentration. (Tr. 494)

Dr. Kimbell completed a second medical questionnaire on October 14, 2013. (Tr. 616-618) In it, he diagnosed rheumatoid arthritis, depression with anxious features and irritable bowel syndrome. (Tr. 617) He indicated that IBS and RA where chronic conditions and that RA was a progressive disease, "with progressive debilitation and chronic pain despite treatment." (Tr. 618) In describing Ferris's limitations, resulting from her conditions, Dr. Kimbell stated,

"chronic pain hands, wrists, worse with activity, requiring narcotic pain medications. New lung involvement with increase dyspnea limited [illegible], increased fatigue. Mood lability, trouble with concentration. Unpredictable bowel pattern with increased need for bathroom." (Tr. 618)

On September 15, 2014, Ferris's treating psychiatrist, Dr. Kanubhai Patel, completed two questionnaires: a psychiatric review technique form and a mental residual functional capacity assessment. (Tr. 655, 669) Dr. Patel diagnosed depressive syndrome characterized by anhedonia, sleep disturbance, psychomotor retardation, decreased energy, feeling of guilty or worthlessness or difficulty concentrating or thinking (Tr. 658); and anxiety accompanied by motor tension, apprehensive expectation and vigilance and scanning. (Tr. 660) Dr. Patel opined that Ferris was moderately limited in her ability to understand and remember detailed instructions and in her ability to travel to unfamiliar places or use public transportation but he also indicated that he did not have enough evidence to rate Ferris's limitations. (Tr. 669-670) In the remarks section of the mental residual functional capacity assessment, Dr. Patel stated that he was "[u]nable to determine ability to function in workplace since Polly has been unable to work since Sept. 2009. – She developed rheumatoid arthritis in 2011 and this has further added to her difficulty in functioning and performing ADL's." (Tr. 671)

**C.     ALJ Hearing Testimony**

**1.     Ferris's Testimony**

At her June 24, 2015 ALJ hearing, Ferris testified as follows: (Tr. 143-177)

- She was born on August 21, 1963 and was fifty one years old at the time of the hearing. (Tr. 146)

- Ferris completed high school and two years of business management school. (Tr. 154)

- She was living with her husband in a single-family home. (Tr. 147)

10

- Ferris is 5'7" and weighed 170 pounds. She had gained 40 pounds in the past three years, which she attributed to her medications. (Tr. 147)

- Ferris worked at First Merit from 2000 to 2009. (Tr. 152) Her most recent position at First Merit was in the credit recovery department. The first five years of that job involved mostly data entry. The last five years Ferris was the team leader. (Tr. 151) As team leader, she was authorized to hire people and supervised over twenty people at one point. (Tr. 148-149) Ferris sat approximately 75% of the time in that position. She was occasionally required to lift up to 40 pounds. (Tr. 149) Prior to her work in the credit recovery department, Ferris worked in the collections department. (Tr. 152)

- Toward the end of her employment with First Merit, Ferris was transferred back to the collections department. She worked there for a year and a half before quitting. Ms. Ferris felt that she had not received proper training and that she was fighting depression and anxiety. She did not "want to go to work." (Tr. 153)

- Ferris had been treating for anxiety and depression since she left First Merit in 2009. She had not looked for other work because she did not feel that she could give 100% to any employer. (Tr. 154) Ferris was treating with Dr. Patel and attending counseling with Jennifer Evans. (Tr. 156) Ferris had an anxiety attack while driving. (Tr. 156) She also had difficulty concentrating. (Tr. 157) Ferris had crying spells approximately three times a month. (Tr. 157) Ferris felt that she had at least 15 bad days in a month.

- Ferris had also been diagnosed with irritable bowel syndrome, chronic obstructive pulmonary disease, rheumatoid arthritis, rheumatoid lung, dry eye syndrome and ocular migraines. (Tr. 155)

- Ferris was taking medication for IBS. She typically needed to use the restroom four to five times per day. She also experienced intermittent bloating and intestinal pain. (Tr. 157-159)

- Ferris was having an ocular headache about one time each month. During her headaches, she lost peripheral vision. If she rested and put a cold compress on her eyes for 25-30 minutes, the headaches went away. (Tr. 159-160)

- Ferris took medication for COPD and emphysema. She used her inhaler about twice a month for those conditions. Ferris also experienced shortness of breath due to rheumatoid lung. (Tr. 161)

- Ferris was diagnosed with rheumatoid arthritis in February 2012. It came on suddenly and, at first, she required her husband's assistance with activities of daily living. Her condition improved with treatment. Ferris was taking medication for RA which mostly affected her shoulders, hands, fingers, wrists and feet. (Tr. 162-163) Ferris's RA symptoms had improved since her diagnosis. (Tr. 175)

- Because of RA, Ferris had trouble gripping anything.  She did not believe she would be able to work on a computer or do data entry.  However, she was able to use a computer at home, "every once in a while, but not often.  I wouldn't even say daily." (Tr. 164)  Ferris also had trouble walking due to her RA.  (Tr. 165)

- Ferris thought that her medications caused side effects, such as headaches and fatigue. (Tr. 166)

- Ferris typically slept in the morning till she awoke (sometimes as late as 12:30 p.m.). She would then take her medication and get something to eat.  She then sat for approximately two hours while her medication was taking effect. (Tr. 166)  She tried to do a load of laundry each day.  She couldn't fold it, but she put it into the washer. (Tr. 167)

- Ferris had trouble sleeping.  She usually woke two or three times per night.  She often took a nap during the day. (Tr. 167)

- Ferris was able to drive but did so rarely due to her anxiety.  She was able to dress herself, cook light meals, and do light housekeeping such as dusting or straightening up.  She was able to do grocery shopping but not heavy lifting.  She could load the dishwasher but had difficulty unloading it. (Tr. 168-169)

- Ferris could lift a four pound bag of sugar and a gallon of milk.  (Tr. 176)

- Ferris had difficulty climbing stairs.  (Tr. 169)  She felt that she could walk approximately three city blocks with no problem.  After that, she would be short of breath.  (Tr. 170)

- Ferris had two hobbies.  She liked to go to auctions with a girlfriend and she liked gardening, although she didn't "necessarily plant them."  (Tr. 171)

- Medication was helping with Ferris's depression.  She was not having any relationship problems with family or friends. (Tr. 172-173)

- Ferris smoked for thirty years.  She quit smoking 60 days before the hearing.  Her breathing had improved since she stopped smoking.  (Tr. 174)

### 2.    VE's Testimony

- Vocational Expert Eric Dennison ("VE") also testified at the hearing (Tr. 178-191):

- Ferris's work history included jobs as a manager for credit and collections and as a bank collection clerk.  Both of these jobs were sedentary positions at the light exertional level. (Tr. 178-179)

- The VE was asked to consider a hypothetical individual of the same age, with the same education and past work experience as Ferris. The individual could lift and carry ten pounds frequently and twenty pounds occasionally; could sit, stand, and walk for six hours each workday; could push and pull as much as she could lift; could use hand controls frequently; could reach overhead only occasionally and frequently in all other directions; could handle frequently and finger occasionally; could occasionally crawl; could frequently climb ramps and stairs, but could not climb ladders or scaffolds. The individual could not be exposed to unprotected heights and could have no more than occasional exposure to dusts, odors, fumes, and pulmonary irritants. The person could perform simple tasks but not at a production rate pace. She would need to be off task ten percent of the time in an eight-hour workday. (Tr. 180-181)

- The hypothetical individual would not be able to perform Ferris's past jobs but she would be able to work as an information clerk, an office helper and/or a photocopy machine operator. There were a significant number of each of these jobs at the national economy. (Tr. 181)

- When the hypothetical individual was limited to lifting ten pounds, she would still be able to perform the three jobs identified by the VE. (Tr. 182)

- If the individual was absent from work one day each month, she would still be able to perform the jobs identified by the VE. The VE testified that most employers would tolerate one absence per month but not two. (Tr. 183-186) Most employers would not tolerate an employee being off task up to fifteen percent of the time. (Tr. 185-186)

- When asked to reconsider the first hypothetical individual but to limit her work to the sedentary exertional level, the VE testified that the individual would be able to perform the jobs of document preparer, addresser, and/or callout operator. There were a significant number of each of these jobs at the national economy. (Tr. 184-185)

- The VE testified that his opinions were consistent with the DOT. (Tr. 181, 184, 185, 186) He later qualified his opinions by stating that they were based on his twenty plus years of experience. (Tr. 187) Two of the jobs listed after the first hypothetical question required frequent fingering. (Tr. 187)

- If the first hypothetical individual were limited to only occasional reaching, handling and fingering, most jobs would be eliminated. (Tr. 189-190)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the

existence of a disability. "Disability" is defined as the "inability to engage in any substantial

13

gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]….

42 U.S.C. § 423(d)(2)(A).

In making a disability determination under this definition, an ALJ is required to follow the five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v.*

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner

at Step Five to establish whether the claimant has the RFC and vocational factors to perform

work available in the national economy. *Id.*

## V.   The ALJ's Decision

The ALJ issued a decision on July 23, 2015, issuing the following paraphrased findings:

1. Ferris met the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 126)

2. Ferris had not engaged in substantial gainful activity from September 30, 2009, the alleged onset date, through December 31, 2014, the date last insured. (Tr. 126)

3. Ferris had the following severe impairments: irritable bowel syndrome, arthralgia, myalgia, rheumatoid lung, chronic obstructive pulmonary disease, emphysema, depression and anxiety disorder. (Tr. 126)

4. Through the date last insured, Ferris did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 126)

5. Through the date last insured, Ferris had the residual functional capacity ("RFC") to perform light work with lifting and carrying ten pounds occasionally and 10 pounds frequently; sitting for six hours in an eight-hour workday; standing/walking for six hours in an eight-hour workday; pushing and pulling as much as she could lift and carry; frequent bilateral hand controls; occasional reaching overhead bilaterally; frequent bilateral reaching in all other directions; frequent bilateral handling; occasional bilateral fingering; frequent climbing of ramps and stairs, but she could never climb ladders, ropes or scaffolds. She could occasionally crawl. Ferris could not work around unprotected heights and could only occasionally be exposed to dust, odors, fumes and pulmonary irritants. She could perform simple tasks but not at a production rate pace. She would need to be off task ten percent of the time in an eight-hour workday. (Tr. 128)

6. Ferris was unable to perform any past relevant work. (Tr. 133)

7. She was born on August 21, 1963 and was 51 years old on the alleged onset date. As of the date last insured, Ferris was in a group classified as "an individual closely approaching advanced age." (Tr. 134)

8. Ferris had at least a high school education and was able to communicate in

English. (Tr. 134)

9. Transferability of job skills was not material to the determination of disability because the claimant was "not disabled" according to the Medical-Vocational Rules. (Tr. 60)

10. Through the date last insured Ferris could perform a significant number of jobs in the national economy. (Tr. 134)

Based on these findings, the ALJ determined that Ferris was not under a disability from September 9, 2009, the alleged onset date, through December 31, 2014, the date last insured. (Tr. 135)

## VI.    Law & Analysis

### A.    Standard of Review

This court's review is limited to determining whether substantial evidence in the record supported the ALJ's findings of fact and whether the ALJ correctly applied the appropriate legal standards. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (*quoting Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The court must also determine whether the Commissioner applied proper legal standards. If not, the court must reverse the Commissioner's decision, unless the error of law is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence,

however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B. Residual Functional Capacity

Ferris contends that the ALJ did not support his residual functional capacity with substantial evidence in the record. (ECF Doc. #11, Page ID # 1176-1180) Ferris also contends that the ALJ improperly rejected all of the medical opinions in the record and determined Ferris's residual functional capacity from raw medical data. (ECF Doc. #11, Page ID # 1177) The undersigned disagrees.

An ALJ's residual functional capacity determination is proper when it is based upon "all of the relevant medical and other evidence." 20 C.F.R. § 416.945 (a) (3). In the sequential analysis, the ALJ determines the residual functional capacity just before deciding whether the claimant can perform past relevant work at Step Four and whether there are other jobs in the

national economy that the claimant can perform at Step Five. A claimant is not disabled if she

can perform past relevant work. At Step Five, the ALJ, using the previously-determined RFC,

determines whether the claimant is able to work in other jobs, given her limitations. A claimant

is disabled if she is unable to work or there are no jobs she is capable of performing. See 20

C.F.R. § 404.1520(a)(4).

At its most basic level, a claimant's residual functional capacity is simply an indication of

a claimant's work-related abilities despite her limitations. See 20 C.F.R. § 404.1545(a)(1). The

residual functional capacity is not a medical opinion, but an administrative determination

reserved to the Commissioner. See 20 C.F.R. § 404.1527(e)(2). Accordingly, the ALJ bears the

responsibility for determining a claimant's residual functional capacity, based on all of the

relevant evidence. See 20 C.F.R. § 404.1545(a)(3).

Under 42 U.S.C. § 405(g), the findings of the ALJ are conclusive if they are supported by

substantial evidence. The substantial evidence standard presupposes that there is a "zone of

choice" within which the Agency may proceed without interference from the courts. *Mullen v.

Bowen,* 800 F.2d 535, 545 (6th Cir. 1986). The ALJ's decision must be affirmed if it is

supported by substantial evidence even if the reviewing court would have decided the matter

differently and substantial evidence also supports a different conclusion. *Her v. Comm'r of Soc.

Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen*, 800 F.2d at 545.

Ferris argues that the ALJ rejected all of the medical opinions except the opinion of

treating ophthalmologist, Dr. Cannatti. (ECF Doc. #11, Page ID # 1178) This is an exaggeration

of the ALJ's analysis of the medical opinions in the record. The ALJ's decision assigned some

weight to the opinions of Dr. Magleby, Dr. Patel, Dr. Kimbell, and the reviewing state agency

medical consultants. (Tr. 132-133) Ferris does not actually argue that the ALJ mishandled the

medical opinions or failed to provide adequate explanations for the weight he assigned to each one.  Rather, Ferris contends that the ALJ formed the RFC from raw medical data rather than following the medical opinions.  But this argument finds little support in the record.

Ferris argues that the ALJ rejected the opinion of a treating source, Dr. Kimbell, regarding Ferris's rheumatoid arthritis. (ECF Doc. #11, Page ID # 1178)  In a questionnaire that he completed, Dr. Kimbell wrote "chronic pain hands, wrists, worse with activity, requiring narcotic pain medications." (Tr. 618)

The ALJ did not expressly reject Dr. Kimbell's opinion.  As already stated, the ALJ assigned "some weight" to his opinion.  The ALJ noted that Dr. Kimbell had determined that Ferris would have chronic pain in her hands and wrists that would be worse with activity due to arthritis.  (Tr. 133)  Part of the problem with Dr. Kimbell's opinion is that he never described the functional limitations that Ferris's chronic pain – presumably resulting from her RA – would cause.  By merely stating that Ferris would have chronic pain requiring pain medication, Dr. Kimbell's opinion offered little guidance to the ALJ to support a more restrictive RFC, i.e. that she would be able to do even less than what the ALJ found she could do despite her RA.

Ferris argues that the ALJ relied solely on raw medical data when he determined that Ferris could engage in "frequent" use of hand controls, "frequent" reaching, "frequent" handling, and "occasional" fingering.  Ferris argues that this finding is not supported by substantial evidence.  However, the ALJ did not rely solely on raw medical data in forming this portion of the RFC.  Rather, the RFC for Ferris's fine manipulation matches that of the agency reviewing physicians, Dr. Golestany and Dr. Mormol.[3]  And the ALJ's RFC determination is actually *more*

---

[3] Ferris's reply brief argues that the ALJ should not have relied on the opinions of Drs. Golestany and Mormol because they did not review the entire record.  ECF Doc. 14, Page ID# 1224.  However, the record and Ferris's testimony actually demonstrate that Ferris's symptoms from RA were improving. (Tr.

limited than the opinions of Dr. Golestany and Dr. Mormol in other manipulative categories, thereby *favoring* Ferris's position. For example, Dr. Golestany and Dr. Mormol indicated that Ferris was *unlimited* in her ability to reach in any direction including overhead and in her ability to handle. (Tr. 222) The ALJ limited Ferris's RFC to *occasional* reaching overhead, *frequent* reaching in all directions and *frequent* bilateral handling. (Tr. 128) Thus, the ALJ's RFC was more restrictive than some of the medical opinions in the record.[4] Conversely, Ferris has failed to identify any medical opinion in the record that was more restrictive than the ALJ's RFC. Instead, Ferris points to portions of the medical records and argues that the ALJ should have assessed Ferris's residual functional capacity differently. In so doing, Ferris actually faults the ALJ for not looking at raw medical data (albeit the data that benefits Ferris) when determining Ferris's RFC. It was the ALJ's responsibility to determine Ferris's residual functional capacity after reviewing all of the evidence in the record. It is quite apparent from the record that the ALJ fulfilled this responsibility; that's how his RFC determination resulted in more restrictive limitations than any one medical source recommended. The ALJ's RFC determination is supported by substantial evidence, and Ferris's first argument is not well taken.

---

175) Moreover, there are no medical opinions in the record that the Ferris had greater functional limitations than those assessed by the ALJ.

[4] Because his RFC determination was more restrictive than the opinions expressed by non-examining state agency physicians, the ALJ's departure from their opinions was, at most, harmless error. The Supreme Court has recognized that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citing, e.g., *Nelson v. Apfel*, 131 F.3d 1228 (7th Cir. 1997). Citing Congressional intent that reviewing courts not become "impregnable citadels of technicality," the Court warned against use of mandatory presumptions and rigid rules to decide if errors are harmless. *Id.* at 407 (internal citations omitted). Instead, the reviewing court must "directly ask[] the harmless-error question," which forbids "reversing for error regardless of its effect on judgment." *Id.* at 409.

### C. The ALJ's Decision at Step Five

Ferris contends that she was an individual who had attained the age of 50 and was capable of no more than sedentary, unskilled work. As such, she argues that she met the Grid Rule and should have been found disabled on that basis. 20 C.F.R. Part 404, Subpart P, Appendix 2, Medical-Vocational Rules 201.12 & 201.14.

Once an administrative law judge determines a claimant's residual functional capacity, he may use the medical-vocational guidelines, or "grids," to determine the claimant's level of disability and potential for employment. The grids categorize jobs by their physical-exertion requirements, namely, sedentary, light, medium, heavy, and very heavy. See Social Security Ruling 83-10, 1983 SSR LEXIS 30. There are numbered tables for the sedentary, light, and medium exertional levels (Tables 1, 2, and 3, respectively), and a specific rule, not applicable here, for the heavy and very heavy levels. Social Security Ruling 83-10, 1983 SSR LEXIS 30; 20 C.F.R. Part 404, Subpt. P, App. 2. Using the claimant's residual functional capacity, the administrative law judge must first determine which table to apply, if any. For instance, if the claimant's residual functional capacity limits her to a sedentary exertional level, then Table No. 1 is applicable. Next, based on the claimant's age, education, and previous work experience, the rule directs a finding of "disabled" or "not disabled." The administrative law judge can utilize the grids only where the grids accurately and completely describe the claimant's abilities and limitations. Therefore, a finding of "disabled" or "not disabled" based solely on the grids is only appropriate when the claimant has the ability to perform a full range of either medium, light or sedentary work.

Here, the ALJ determined that Ferris was capable of performing less than a full range of light work. (Tr. 128) Ferris argues that her exertional level should have been limited to

sedentary work because the ALJ limited her ability to lift and carry 10 pounds. ECF Doc. 11 at Ex. 46, Page ID# 1180. However, Ferris's residual functional capacity was not squarely within the grid for sedentary work.[5] Although the ALJ's RFC limited Ferris to lifting and carrying up to ten pounds, other portions of Ferris's RFC (such as her ability to sit, stand and walk throughout the workday) placed her functional abilities within the light work capability.[6] Also, the definition of light work provides that the individual can lift "no more" than 20 pounds; it does not provide that the individual must be able to lift at least 20 pounds.

When a claimant's RFC is not squarely within either grid, the grid guidelines are not binding and instead are used only as an analytical framework. 20 C.F.R. Part 404, Subpt. P, App. 2, § 200.00(d). In such a situation, Social Security Ruling 83-12, 1983 SSR LEXIS 32 directs that the ALJ call a vocational expert to testify as to whether a significant number of jobs exist in the national economy that a hypothetical individual with the claimant's limitations can perform. So long as the hypothetical is accurate, the ALJ may rely on the vocational expert's testimony to find that the claimant can perform a significant number of jobs in the national economy. *See Brannon v. Comm'r of Soc. Sec.,* 539 Fed. App'x. 675, 680 (6th Cir. 2013). The ALJ determined that Ms. Ferris's RFC did not fall squarely within the definition of light work capability grid and

---

[5] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
[6] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

he called a VE to testify. Contrary to Ferris's argument, the ALJ did not fail to follow social security guidelines in his application of the grids or medical-vocational guidelines.

Ferris also argues that the ALJ erred at Step 5 in relying on VE testimony that contradicted the *DOT*. First, Ferris argues that the VE's testimony contradicted the *DOT* because he opined that the hypothetical individual could work as an information clerk even though that position requires a reasoning level of 4, which Ferris argues is inconsistent with "simple" work. However, the Sixth Circuit has held that, "[w]hile the Commissioner 'will take administrative notice of reliable job information available from . . . [the] *Dictionary of Occupational Titles*,' 20 C.F.R. § 404.1566(d), 'the Social Security regulations do not obligate [the ALJ and consulting vocational experts] to rely on the *Dictionary's* classifications.'" *Monateri v. Comm'r of Soc. Sec.,* 436 F.App'x 434, 446 (6th Cir. 2011) (citing *Wright v. 8,* 321 F.3d 611, 616 (6th Cir. 2003); *Conn v. Sec. of Health and Human Servs*., 51 F.3d 607, 609 (6th Cir. 1995)). The Commissioner is not required to align *DOT* "reasoning levels" with RFC classifications. *Id.*

Moreover, the case law cited by Ferris does not advance her argument. *Zavalin v. Colvin,* 778 F.3d 842, 847 (9th Cir., 2015) is a non-controlling Ninth Circuit case. *Frye v. Astrue,* 2012 U.S. LEXIS 69520, *59-66 (N.D. Ohio 2012), involved an incomplete VE hypothetical. Here, the ALJ included a limitation of simple tasks when posing the hypothetical question to the VE. Consequently, *Frye* is factually distinguishable. *Joyce v. Comm'r,* 662 Fed. App'x. 430, 435-436 is also distinguishable because, in *Joyce,* the ALJ failed to ask whether the VE's testimony was consistent with the *DOT*. Here, the ALJ asked the VE this question several times. (Tr. 181, 184, 185, 186) Ferris's argument that the ALJ erred in relying on the VE's testimony lacks factual and legal support and is not well taken.

Second, Ferris argues that the VE's testimony contradicted the *DOT* because the two remaining jobs the VE identified require "frequent" rather than occasional fingering. When Ferris's counsel questioned the VE regarding this discrepancy, the VE testified that he based his opinion on his twenty plus years of experience. (Tr. 187) Ferris contends that the ALJ was required to ask the VE about the erosion of the marketplace for such jobs and that his failure to do was reversible error. Ferris again cites non-binding California and Ninth Circuit precedent to support this argument. *Nicholas v. Colvin,* 2013 U.S. Dist. LEXIS138994 at *32-34 (C.D. Cal. Sept. 20, 2013) (citing *Tackett v. Apfel,* 180 F.3d 1094, 1100 (9th Cir. 1999).

Social Security Ruling 00–4p provides that an ALJ must elicit a reasonable explanation from a VE when there is an apparent conflict between the VE's testimony and the *DOT*:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the *DOT*. When there is an apparent unresolved conflict between the VE or VS evidence and the *DOT*, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearing level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

S.S.R. 00–4p, 2000 WL 1898704, at *2 (2000). The Sixth Circuit has interpreted SSR 00-4p to require that the ALJ to question the VE on whether there is a conflict between the VE's testimony and the *DOT*. *Lindsley v. Comm'r of Soc. Sec.,* 560 F.3d 601, 601 (6th Cir.2009).

Neither the testimony of a VE nor the occupational descriptions from the *DOT* necessarily trump the other. *Ledford v. Astrue*, 311 F. App'x 746, 757 (6th Cir. 2008)*; Wright,* 321 F.3d at 616 (holding that "the ALJ and consulting vocational experts are not bound by the *Dictionary* in making disability determinations because the Social Security regulations do not obligate them to rely on the *Dictionary's* classifications"). However, if there appears to be a conflict with the *DOT*, the ALJ must obtain a "reasonable explanation" for the apparent conflict.

*Id*.  The Sixth Circuit has consistently held that when a VE asserts that his testimony is not in conflict with the *DOT*, the ALJ may rely on that testimony and is under no obligation to investigate the accuracy of said testimony.  *Id*.; *see also Kyle v. Comm'r of Soc. Sec.,* 609 F.3d 847, 858 (6th Cir.2010) ("[E]ven if a conflict existed, the ALJ inquired properly if the VE's testimony was consistent with the *DOT* and was given a response in the affirmative. Therefore, the ALJ met her obligation under SSR 00–4p and there was no error relying on the positions the VE offered."); *Beinlich v. Comm'r of Soc. Sec.,* 345 F. App'x 163, 168 (6th Cir. 2009) (Finding that the ALJ fulfilled his duty under SSR 00-4p by inquiring into any discrepancies between the VE's testimony and the *DOT*); *Martin v. Comm'r of Soc. Sec.,* 170 F. App'x 369, 374 (6th Cir. 2006) (Noting that the ALJ need not explain how a conflict was resolved under SSR0-4p where the conflict was not brought to the ALJ's attention).

Sixth Circuit precedent also provides that the ALJ and VE are not bound by the *DOT* in making disability determinations because the Social Security regulations do not obligate them to rely on the *Dictionary's* classifications. *Beinlich,* 345 Fed. Appx. at 168 (citing *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003)).  Here, the ALJ complied with SSR 00-4p, 2000 SSR LEXIS 8, by asking the VE (several times) whether his testimony was "consistent with the *DOT*." (Tr. 181, 184, 185, 186)  See *Lindsley*, 560 F.3d at 606.  And it was proper for the VE to base his opinion, in part, on his own knowledge and over twenty years of experience. *See DiPalma v. Comm'r,* 2015 U.S. Dist. LEXIS 125880 at * 11 (N.D. Ohio Sept. 21, 2015).  The VE provided a reasonable explanation for any inconsistency that existed between his testimony and the *DOT*. And it was permissible for the VE to rely on his own professional experience when determining whether a person with the sorts of limitations Ferris has would be able to perform the jobs he testified to.  The ALJ did not err in relying on the VE's testimony.

**D.     Credibility Determination**

Finally, Ferris argues that the ALJ erred in assessing her credibility.  The ALJ stated:

> The claimant's allegations are determined to be less than fully credible.  The nature and degree of pain and functional limitations alleged by the claimant is not *[sic]* supported by medical and non-medical sources.  The claimant's rheumatoid arthritis symptoms have improved since her diagnosis in 2012.  For example, in December of 2014, she reported no new health problems or symptoms to suggest infection to Dr. Raynor (Exhibit 21F, pg. 2).  In addition, the claimant admitted at the hearing that her migraine symptoms have not changed since her diagnosis in 2008, and Dr. Cannatti determined that she has no limitations from this condition (as discussed in greater detail below ) (Exhibit 4F, pg. 5).  The claimant has a history of non-compliance with medical recommendations, further eroding the credibility of his allegations.  In spite of her issues with COPD and emphysema, she repeatedly indicated that she was smoking up to one pack of cigarettes per day (Exhibit 1F, pg. 14)  She testified that she quit smoking 60 days ago, and her breathing has improved as a result (hearing testimony).

(Tr. 131)

Ferris contends that the ALJ should not have considered her smoking habit as a "prolonged history of non-compliance."  Ferris then argues that, even if she had stopped smoking, there is no indication that the biologic medication (which she could not take due to continued smoking) would have improved her overall medical condition.  She points to portions of the records stating that the biologic medication, when attempted, provided little benefit. ECF Doc. 11, Page ID# 1184 (citing Tr. 774).  Ferris relies upon cases from the Seventh Circuit, and a California district court in support.  Ferris also cites *Hicks v. Comm'r of Soc. Sec.,* 2009 U.S. Dist. LEXIS 89481 at *11 (S.D. Ohio Sept. 28, 2009).  In *Hicks,* a district court sustained the unopposed objections of a claimant to the magistrate's report and recommendation.  In one of the objections, Hicks argued that the ALJ should not have considered his smoking 1-2 cigarettes per day in assessing his credibility.  Hicks relied on case law from the Seventh Circuit in making this argument.  The court did not thoroughly analyze Hicks' uncontroverted objection, nor did it hold

that smoking could not be considered in assessing credibility. Rather, it appears that the court sustained Hick's objection because it was unopposed.

Under Sixth Circuit precedent, the ALJ may consider continued smoking when assessing credibility. See *Sias v. Sec'y of Health and Human Services*, 861 F.2d 475, 480 (6th Cir. 1988); *Steward v. Comm'r of Soc. Sec.*, 2015 U.S. Dist. LEXIS 31643 at *4-11(E.D. Mich., Feb. 9, 2015); *Blaim v. Comm'r of Soc. Sec.,* No. 14-1110, 595 Fed. Appx. 496, 2014 U.S. App. LEXIS 23466, 2014 WL 6997509, at *3 (6th Cir. Dec. 11, 2014) ("[T]he ALJ noted that parts of Blaim's testimony were contradicted by the record, and that Blaim's conservative treatment schedule and persistent refusal to take his medications or quit smoking—as his doctors repeatedly advised— suggested that his condition was not as serious as Blaim made it out to be."); *Brown v. Soc. Sec. Admin.,* 221 F.3d 1333 (table) [published in full-text format at 2000 U.S. App. LEXIS 15344], 2000 WL 876567, at *1 (6th Cir. 2000) ("Although Brown suffers from chronic obstructive pulmonary disease, his heavy smoking habit indicates that the condition is not disabling"); *Marshall v. Comm'r of Soc. Sec.*, No. 13-CV-14255, 2015 U.S. Dist. LEXIS 21547, 2015 WL 777940, at *7 (E.D. Mich. Feb. 24, 2015) (recognizing that in *Shramek v. Apfel*, 226 F.3d 809 (7th Cir. 2000), the Seventh Circuit held, in part because of the addictive nature of cigarettes, that an ALJ erroneously relied on a claimant's failure to quit smoking to discount the claimant's credibility, but concluding that the "Sixth Circuit . . . has taken a different approach and considers whether a claimant has followed a physician's advice to quit smoking to be a relevant factor in evaluating the claimant's credibility.")

Here, many medical records contain physician recommendations that Ferris should stop smoking and document the negative impact that smoking was having on her treatment. (Tr. 420,

514, 619, 649-651, 679, 866-867, 754, 776, 781)  The ALJ was permitted to consider this information in assessing Ferris's credibility regarding the severity of her medical conditions.

Ferris argues that the ALJ incorrectly noted that Ferris's rheumatoid arthritis had improved.  Pointing to specific medical records noting continued synovitis, Ferris argues that the ALJ's statement is not supported by substantial evidence.  However, the ALJ's finding regarding improvement of Ferris's RA *was* supported by evidence from the record.  In fact, Ferris actually testified that her RA symptoms had improved since first diagnosed. (Tr. 175)

Ferris also argues that the ALJ erred by failing adequately to credit her admirable work history when assessing her credibility.  Although there are cases holding that a claimant with a good work record is entitled to substantial credibility when claiming an inability to work, *See Singletary v. Secretary of Health, Education and Welfare*, 623 F.2d 217, 219 (2d Cir. 1980), there is no indication that the ALJ refused to consider Ferris's work history here.  The ALJ did not completely reject Ferris's testimony regarding her abilities.  In fact, he relied heavily on Ferris's own statements when assessing her credibility.  In concluding that her statements regarding the intensity, persistence and limiting effects of her symptoms were not fully credible, the ALJ stated:

> Moreover, the claimant engages in a variety of daily activities that indicate a greater level of functioning than alleged.  For example, she testified that she goes to auctions with a friend, does household chores such as light laundry loads, and goes grocery shopping with her husband. (hearing testimony).  The claimant previously told Dr. Magleby that she is mostly capable of independent activities of daily living, and she performed housework and took care of her dog. (Exhibit 5F, pg. 4)  Thus, there are no indications in the medical record of limitations beyond the performance of light level work with the non-exertional restrictions listed above.

(Tr. 131-132)

The ALJ did not summarily reject Ferris's complaints; rather, after reviewing the evidence, he determined that the record did not fully support Ferris's statements regarding the severity of her symptoms. Ferris has not shown how this determination was erroneous – particularly in light of the substantial deference accorded to an ALJ's credibility determination. *See Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir.1987); *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987). This court "may not disturb" a credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ's credibility assessment was supported by substantial evidence in the record; there is no compelling reason to disturb his assessment.

**VII.    Conclusion**

Although Plaintiff Polly Anne Ferris suffers from a number of truly challenging conditions, the Commissioner of Social Security denied her claim based on the finding that there were jobs she could perform despite her conditions. Because the Commissioner's decision was supported by substantial evidence it must be, and is hereby, AFFIRMED.

IT IS SO ORDERED.

Dated: November 8, 2017

Thomas M. Parker
United States Magistrate Judge